IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 7, 2016 Session

**DEANDRE BLAKE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 0806637  John Wheeler Campbell, Judge**

_____

**No. W2015-01423-CCA-R3-PC  -  Filed July 27, 2016**

_____


The petitioner, Deandre Blake, appeals the post-conviction court's denial of his petition for post-conviction relief in which he challenged his convictions for two counts of felony first degree murder and resulting life sentence.  On appeal, the petitioner contends that he received ineffective assistance of counsel at trial.  Upon reviewing the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

BRANDON O. GIBSON, S.J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

James Jones, Jr., Memphis, Tennessee, for the appellant, DeAndre Blake.

Herbert H. Slatery III, Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and Kirby May, Assistant District Attorney General, for the appellee, State of Tennessee.


**OPINION**

The petitioner was convicted of first degree felony murder during the perpetration of aggravated child abuse and first degree felony murder during the perpetration of aggravated child neglect.  The petitioner's convictions arose from the death of his two-year-old daughter on July 28, 2008.  The trial court merged the convictions and sentenced the petitioner to life imprisonment.  This Court affirmed the petitioner's convictions on direct appeal and remanded the case to the trial court for the entry of one judgment reflecting merger.  *See State v. Deandre Blake*, No. W2010-00468-CCA-R3-CD, 2011

WL 4433651, at *1, 12 (Tenn. Crim. App. Sept. 23, 2011), *perm. app. denied* (Tenn. Feb. 15, 2012) (not for citation).

This Court summarized the evidence presented at trial in its opinion on direct appeal as follows:

At trial, Pamela Rogers, the victim's mother, testified that the defendant was the father of the victim. The three, along with "Quinton," the defendant's "play cousin," lived together in July 2008 in a one-bedroom apartment. Ms. Rogers testified that, on July 27, she, the defendant, and the victim returned home from a friend's house where Ms. Rogers had washed clothes. Ms. Rogers took a bath and retired. When she changed the two-year-old victim into night clothes, she noticed no marks or bruises on the victim's body, and the victim made no complaints. The victim, who was in the process of "potty" training, wore "pull-up" underpants. The victim slept in the bed with Ms. Rogers and the defendant. Quinton slept on the bedroom floor.

Ms. Rogers slept until 1:36 p.m. on July 28 and was alone in the bedroom when she awoke to a slapping sound and the defendant's voice coming from the bathroom. Ms. Rogers heard the defendant's telling the victim to say "pot" and heard the victim's crying. Ms. Rogers testified that she heard the slapping sound five to ten times. After about ten minutes, the victim walked out of the bathroom crying. The defendant emerged from the bathroom with a white belt in his hand. Ms. Rogers admitted that she did not ask the defendant about what he had been doing. The victim lay on the bed, and the defendant left the apartment to check the mail. Ms. Rogers noticed bruises on the backs of the victim's legs.

When the defendant returned to the apartment with the mail, he told Ms. Rogers that she had received a letter from the Department of Human Services about missing her "benefits" appointment. Ms. Rogers went to the kitchen to call the department about the missed appointment. She testified that the defendant made a bologna sandwich for the victim and took it into the bedroom where the victim had remained. Ms. Rogers testified that, afterward, the defendant yelled to her in an angry voice that the victim was "crumbling up" the bread. Ms. Rogers, still on the telephone, heard the defendant hit the victim about three times and heard the victim's crying.

2

When the defendant came back to the kitchen and knocked the telephone from Ms. Rogers' ear, she returned to the bedroom and resumed the telephone call while dressing the victim and putting the victim's hair into pigtails. As the victim was sitting on Ms. Rogers' lap, the victim "just slid down" Ms. Rogers' leg. The victim did not get up and was not responsive. Ms. Rogers pulled the victim up, laid her face down across Ms. Rogers' knees, and resumed the telephone call and the pigtailing of the victim's hair. She said the victim was turning her head around. Soon, the victim's "head started to jerking." When the victim opened her mouth, Ms. Rogers saw bologna and bread in her mouth which Ms. Rogers tried to remove with her finger. While Ms. Rogers held the victim, who had been making unintelligible sounds, Ms. Rogers noticed that the victim stopped breathing.

Ms. Rogers testified that she told the defendant that the victim was not breathing and that the defendant made two telephone calls to friends, asking, without success, for a ride to the hospital. The defendant then asked Ms. Rogers whether she wanted to call "911." She told the defendant to place the call. Ms. Rogers continued to hold the victim until "firemen" came to the apartment. The men took the victim to an ambulance and "hooked [her] up . . . to some cords." Ms. Rogers rode in the ambulance to the hospital, where the victim was pronounced dead.

On cross-examination, Ms. Rogers admitted that, when the victim first slid down Ms. Rogers' leg, Ms. Rogers thought she was misbehaving, and she spanked the victim with her hand. On redirect examination, Ms. Rogers testified that the spanking consisted of slapping the victim on the wrist.

Richard Ringer testified that he was a paramedic for the Memphis Fire Department. After testifying about his training and qualifications, he testified that he answered a dispatch on July 28, 2008, to an apartment where he found the unresponsive victim lying on the floor next to the bed. The victim had "agonal respirations"—very slow breathing, usually a sign of proceeding into "respiratory arrest." Mr. Ringer could not discern a pulse. He testified that he determined that the victim had a clear airway before beginning cardio-pulmonary resuscitation (CPR).

3

Mr. Ringer testified that he tried to speak to the child's mother but could not get her to respond. He testified that the defendant was "on his cell phone the majority of the time while we were on the scene." Mr. Ringer said that he "finally did get from the father that he believed the child was choking, he had fed her a baloney sandwich." Mr. Ringer testified that the defendant told him that the victim had been unresponsive about half an hour before the 911 call was made.

Wendy Seely, a Memphis Fire Department "[f]ire fighter/paramedic," testified that she responded to the July 28, 2008 call and found the "first responders" already working on the victim, who was "lying as straight as possible like a soldier at attention." Ms. Seely testified that the victim "wasn't choking"; she found nothing obstructing the victim's airway to her lungs. The lungs were "clear," without sounds of aspiration, which means, she testified, that the victim had not "swallowed any vomiting or drooling or anything else like that." Ms. Seely testified that the appearance of the victim's pupils indicated "[h]ead trauma." Ms. Seely testified that she noticed bruises on the lower half of the victim's body. The victim was "cold to the touch."

Ms. Seely said that she was unable to ask questions of the child's mother because the "baby's father" kept "stepping in between to make sure . . . I couldn't communicate with her."

Memphis Police Department Lieutenant Eddie Bass testified that on July 28, 2008, at about 9:30 or 10:00 p.m., he was assigned the task of team leader in the investigation of the victim's homicide. He identified items that the police found in the Blake apartment, including a white belt. He testified that the police detained the defendant and took him to the police station. Lieutenant Bass assigned Sergeants Lundy and Collins the task of interviewing the defendant.

Memphis Police Department Sergeant Kevin Lundy testified that he along with Sergeant Collins interviewed the defendant on July 28, 2008. He outlined the officers' approach to taking a statement from the defendant in substantially the same manner as did Sergeant Collins in his suppression hearing testimony. He testified that the defendant told him that the victim had "'used the restroom on herself,'" that in response he tried to get her to say "'pot,'" and that when she would not, he "'disciplined'" her. Sergeant

4

Lundy testified that the defendant admitted disciplining the child again with a belt after she "'wadded'" the bread of her sandwich. Based upon these oral statements, the officers asked the defendant to give a formal written statement, which was exhibited to Sergeant Lundy's testimony and read to the jury.

In this typewritten statement, which Sergeant Lundy described as "word for word," the defendant, who was informed that he was under arrest for homicide, answered "Yes" when asked whether he was responsible for the victim's death. The statement described the defendant's actions on July 28, 2008. At about 8:00 a.m., he smoked a "blunt" then went to "one of [his] partner's house." When he returned to his apartment, he put the victim on the "pot" and asked her to say "pot." When she did not, he "whipped her legs and she was trying to block with her hands so [he] hit her hands" and hit her "across the back with a belt" when she bent over. The defendant stated that he later made a bologna sandwich and gave half of it to the victim. When she tried to lie down with the food in her mouth, he "hit her on the legs with a belt." He stated, "That's when she jumped up and act[ed] like she was going to pass out." He said that, after he could not find anyone to take them to the emergency room, he called 911 and that he followed the 911 respondent's telephone instructions for administering CPR.

When asked how many times the defendant struck the victim on the back while she was "on the pot," the defendant said, "A lot of times." The defendant stated that he was in the bathroom with the victim about 30 minutes. The defendant admitted that he had struck the victim on the "butt" and the back "[a] lot of times" and that he used Ms. Rogers' white dress belt, which was approximately one and one-half inches wide.

Doctor Laboy, in the presence of the jury, described his medical education, certifications, and experience and testified that he performed the July 29, 2008 autopsy on the victim's body. He testified about, and introduced photographs to show, a number of abrasions and contusions appearing externally on the victim's right forearm, thighs, and lower legs. Some of the contusions were overlapping.

5

Doctor Laboy explained the dissection procedure used to assess the depth of bruises. He introduced a total of four photographs depicting dissection-exposed injuries to the victim's scalp, buttocks, and legs.

After a detailed description of the damage to tissue revealed in the autopsy, Doctor Laboy opined that the victim died from multiple blunt force trauma that caused "substantial blood loss in soft tissues." He commented that a child weighing about 25 pounds, as did the victim, would have only about a liter of blood in her body and that significant loss of blood through soft tissue injury impairs the body's ability to supply oxygen to vital organs. The doctor was unable to opine whether the belt that had been introduced into evidence was the instrumentality of the injuries because, in part, so many of the contusions were confluent.

*Deandre Blake*, 2011 WL 4433651, at *3-6.

## POST-CONVICTION PROCEEDINGS

The petitioner testified that trial counsel represented him for approximately eight months following his indictment and through the trial. The petitioner maintained that during this period, trial counsel "barely had any contact" with him. He said trial counsel met with him on one occasion at the jail and during his court appearances.

The petitioner stated that trial counsel filed a motion for discovery from the State and a "motion to suppress pictures." The petitioner believed that trial counsel did not want to represent him or take any action to assist him. The petitioner wrote letters to the Tennessee Board of Professional Responsibility and to the trial court. He said trial counsel told him that if he did not want her to continue to represent him, he could either retain other counsel or proceed pro se. The petitioner said his relationship with trial counsel did not improve following this conversation.

The petitioner testified that trial counsel argued at trial that the petitioner "was guilty but not of felony murder." The petitioner stated that he and trial counsel discussed this defense theory prior to trial. He said that after he researched the issue and learned more about his case, he asked trial counsel to present another theory of defense but that trial counsel did not wish to discuss alternative theories with him. The petitioner recalled that during opening statements, trial counsel told the jury that evidence would be presented showing that the petitioner caused the victim's injuries that led to the victim's death.

6

The petitioner acknowledged that he gave a statement to the police admitting that he spanked the victim on the morning of her death. He said he learned at the trial that after he spanked the victim, the victim's mother also spanked her. The petitioner stated that while trial counsel questioned the victim's mother on cross-examination about spanking the victim, trial counsel "never brought it back up again" during the remainder of the trial. The petitioner believed the evidence was relevant because the State had to establish that his actions were the sole cause of the victim's injuries in order to sustain a conviction for felony murder in the perpetration of aggravated child abuse.

The petitioner testified that before the victim had been eating and that when she began showing signs of distress, her mother told the petitioner that the victim was choking. The petitioner said he was performing CPR on the victim when the ambulance arrived. He maintained that he did not accompany the victim to the hospital because he was told to remain in the home and wait for police officers to arrive.

The petitioner stated that he gave a statement to the police at approximately 10:00 p.m. that night while at the homicide office. He said he was not aware of the victim's condition when he gave a statement admitting that he had spanked the victim earlier that day. The petitioner believed that a few hours had passed between his spanking the victim and the ambulance's arrival. He stated that at one point after spanking the victim, he went to a store, and the victim was alone with her mother.

The petitioner testified that he received a sentence of life imprisonment after he was convicted of felony murder. He complained of the trial court's failure to hold a sentencing hearing and stated that the trial court imposed the life sentence immediately after the jury returned its verdict.

On cross-examination, the petitioner testified that he struck the victim more than once and that an ambulance arrived one or more hours later to take the victim to the hospital because she was not breathing. He said an ambulance was requested at approximately 1:00 p.m. He also said that he was performing CPR on the victim as instructed when the paramedics arrived and that he stepped back to allow the paramedics to render aid to the victim. The petitioner stated that the paramedics remained at the home for approximately forty-five minutes before transporting the victim to the hospital. The victim's mother accompanied the victim to the hospital, while the petitioner remained at the home and waited for the police in accordance with the firefighters' instructions.

7

The petitioner testified that when the officers arrived, he invited them to come inside his home and that he and the officers remained in the front room of the home for approximately nine hours until 10:00 p.m. The petitioner said that the officers did not search his home but that they appeared to be waiting on a telephone call. The officers eventually transported him to "201 Poplar" to an interview room. The petitioner stated that the officers shackled him to a chair, advised him of his *Miranda* rights, and took a statement from him. At some point, the officers informed the petitioner that the victim had died.

The petitioner acknowledged that a preliminary hearing was held during which the victim's mother and Detective Lundy testified. The petitioner retained counsel to represent him in the general sessions court, and trial counsel was appointed to represent him after he was indicted. The petitioner stated that trial counsel provided him with a copy of his discovery from the State shortly after she was appointed to represent him, but the petitioner denied that trial counsel reviewed the discovery with him. The petitioner acknowledged that he and trial counsel discussed any questions or concerns, the theory of the defense, and the advantages and disadvantages to proceeding with a trial.

The petitioner testified that when the trial began, he understood trial counsel's defense was to seek a conviction of a lesser-included offense to felony murder. He said he attempted to present her with case law regarding other possible defense theories, including "the Honeycutt case," but that she refused to read the cases. The petitioner acknowledged that evidence that the victim's mother had struck the victim before the victim's death was presented to the jury.

On redirect examination, the petitioner testified that he spanked the victim with a belt as punishment related to potty training the victim. He stated that he wanted trial counsel to investigate any evidence regarding whether there was a "break in the chain" such that his actions did not cause the victim's death but that trial counsel failed do so. On re-cross examination, the petitioner testified that trial counsel filed motions to exclude photographs and evidence of his prior convictions and a motion to suppress his statement based upon a Fifth Amendment violation. The petitioner acknowledged that he testified during the suppression hearing.

Trial counsel testified that the petitioner was arraigned on December 15, 2008, and that his trial occurred on November 30, 2009, approximately one year later. She said that she likely requested a trial date in late May or early June and that the petitioner likely would not have had any other court settings prior to trial unless an issue arose. Trial counsel said a suppression hearing was held approximately two weeks prior to trial. She

8

estimated that she visited the petitioner at the jail on six occasions but acknowledged that she did not know the exact number of visits. Trial counsel and the petitioner also communicated through telephone calls and letters. Trial counsel recalled that prior to the trial, the petitioner wrote letters to the District Attorney General in which he relayed his version of the events.

Trial counsel stated that the petitioner informed her of the events leading to the victim's death. She also stated that, through discovery, she obtained Pamela Rogers' statement to the police in which Ms. Rogers admitted that she had slapped the victim's hand. Trial counsel noted that the physical evidence established that the victim was spanked repeatedly and sustained injuries to her back, buttocks, legs, and arms such that the medical examiner could not determine where one bruise ended and another bruise began. Trial counsel understood that after the petitioner spanked the victim, some time passed before the victim became lethargic and that when the victim began showing signs of distress, the petitioner and Ms. Rogers believed that the victim was choking. Trial counsel did not recall whether any testimony was presented indicating that Ms. Rogers was left alone with the victim after the petitioner spanked the victim.

Trial counsel testified that any strategy implicating Ms. Rogers in the victim's death was not consistent with the physical evidence. Rather, trial counsel believed that a more reasonable defense strategy involved establishing that the petitioner's actions were a form of discipline and that he did not intend to cause the victim's injuries. The trial counsel presented a defense strategy that the petitioner's actions did not constitute child abuse and that he should be convicted of "a lesser charge of negligent or reckless homicide." Trial counsel attempted to elicit testimony from Ms. Rogers at trial that the victim was being potty trained and that the victim was disciplined in relation to the potty training. Trial counsel acknowledged that the elements of the offense required that the person know or should have known that an injury to the child would occur. However, she stated that it was reasonable to believe that young parents, such as the petitioner, would not consider that a child would be severely injured by a spanking with a belt.

Trial counsel testified that while she did not recall her opening statement, if she informed the jury that "it was not a whodunit, that would have been correct." She said she would have told the jury that the evidence did not establish felony murder but a lesser-included offense. She stated that she did not intend to concede the issues. Rather, she explained, "I think the juries appreciate it if you tell them on the front end, we're not trying to blame someone else, we're just saying that it didn't rise to the level of what the state says it rose to."

9

Trial counsel acknowledged that while Ms. Rogers told the police that she slapped the victim's hand, Ms. Rogers denied spanking the victim when she testified during the preliminary hearing. Trial counsel explained that she did not question Ms. Rogers regarding the inconsistency at trial because trial counsel believed that questioning Ms. Rogers' credibility could not have benefited the defense when the goal was to use Ms. Rogers to establish that the petitioner did not intend to injure or kill the victim. Trial counsel acknowledged that the medical examiner's trial testimony was that he could not determine what had been used to spank the victim due to the extensive injuries and that Ms. Rogers testified that the petitioner struck the child with the belt approximately five times. Trial counsel acknowledged that, as a result, questioning Ms. Rogers regarding her inconsistent statements could have been beneficial in presenting a defense theory that the petitioner did not intend to injure the victim and that someone else contributed to the victim's death.

Trial counsel had no evidence that Ms. Rogers caused any injuries that "appeared to have come from a belt." Trial counsel said that investigators from her office attempted to interview Ms. Rogers but that Ms. Rogers' family refused to allow them to have any contact with her. Trial counsel stated that even if the proof established that Ms. Rogers caused more severe injuries that could have exacerbated the victim's death, the earlier injuries caused by the petitioner in and of themselves could have been sufficient to cause the victim's death. Trial counsel also stated that had she argued that Ms. Rogers also spanked the victim and caused additional injuries, the State could have argued that but for the earlier injuries, the victim still would not have died.

Trial counsel testified that after the petitioner was convicted of felony murder, no sentencing hearing was held before the trial court sentenced the petitioner to life imprisonment. Rather, the sentence was automatically imposed. Trial counsel said she explained to the petitioner because the State was not seeking the death penalty or a sentence of life without the possibility of parole, the trial court would automatically impose the minimum sentence of life imprisonment if the petitioner was convicted of first degree felony murder.

Trial counsel recalled that the State inquired as to whether the petitioner was interested in pleading guilty to second degree murder. Trial counsel stated that the petitioner was released on bond on another charge when he was arrested for the victim's murder and that, as a result, any plea agreement would have required that the petitioner's sentence for second degree murder be served consecutively to any sentence for the other pending charge.

10

On cross-examination, trial counsel testified that she had been an assistant public defender for almost twenty-five years. She said that by the time of the petitioner's trial, she had at least one hundred jury trials. Trial counsel's general practice was to meet with the client to obtain information, review discovery with the client, interview any witnesses, obtain a copy of the transcript of the preliminary hearing, meet with the medical examiner, conduct any additional investigation, and file any necessary motions. Trial counsel stated that although there were no defense witnesses to interview in the petitioner's case, she obtained the recording of the 9-1-1 call and met with the medical examiner on multiple occasions.

Trial counsel testified that she met with the petitioner on multiple occasions at the jail and in the courtroom and had several conversations with him over the telephone. The petitioner maintained that he did not intend to kill the victim and that he was not guilty of first degree murder. Trial counsel noted that the petitioner had given a statement to the police, that she filed a motion to suppress the petitioner's statement, and that the trial court denied the motion following an evidentiary hearing. Trial counsel said that the petitioner wrote letters to the District Attorney General that included admissions. The prosecutor provided the letters to trial counsel sometime prior to trial.

Trial counsel stated that based upon her investigation, they decided to argue that the petitioner did not intend to harm the victim and that his actions did not rise of the level of first degree murder. Trial counsel explained that "sometime the juries don't really get felony murder either and if you can kind of hammer away at intent, sometimes they don't understand or it seems to be from various jury decisions that sometimes they don't get felony murder and they do convict of a lesser charge." Trial counsel said that at trial, she questioned Ms. Rogers about slapping the victim on the hand.

Following the hearing, the post-conviction court entered an order denying the petitioner relief. This Court subsequently granted the petitioner's motion to late-file a notice of appeal.

## ANALYSIS

The petitioner contends that trial counsel was ineffective in (1) failing to present evidence implicating the victim's mother and establishing "a break in the chain of events for felony murder"; (2) conceding guilt during the opening statement; and (3) failing to object to the trial court's imposition of an illegal sentence of life imprisonment without first holding a sentencing hearing.

11

To obtain post-conviction relief, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)).

This Court does not reassess the post-conviction court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Rather, assessing the credibility of witnesses is a matter entrusted to the post-conviction judge as the trier of fact. *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The post-conviction court's findings of fact are conclusive on appeal unless the preponderance of the evidence is otherwise. *Berry v. State*, 366 S.W.3d 160, 169 (Tenn. Crim. App. 2011) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997)). Conclusions of law receive no presumption of correctness on appeal. *Id.* (citing *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001)). As a mixed question of law and fact, this Court's review of petitioner's ineffective assistance of counsel claims is de novo with no presumption of correctness. *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (citations omitted).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution require that a criminal defendant receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. Crim. App. 2004) (citing *Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975)). When a petitioner claims that he received ineffective assistance of counsel, he must demonstrate both that his attorney's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007) (citation omitted). If this court holds that either prong is not met, we need not consider the other prong. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004).

To prove that counsel's performance was deficient, petitioner must establish that his counsel's conduct fell below an objective standard of "'reasonableness under prevailing professional norms.'" *Finch*, 226 S.W.3d at 315 (quoting *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006)). Our supreme court has held that

12

"the assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence . . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations."

*Id.* at 315-16 (quoting *Baxter*, 523 S.W.2d at 934-35). In reviewing trial counsel's performance, this Court on appeal "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689).

To prove that petitioner suffered prejudice as a result of counsel's deficient performance, he "must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different." *Vaughn*, 202 S.W.3d at 116 (citing *Strickland*, 466 U.S. at 694). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). Thus, the petitioner must establish that as a result of counsel's deficient performance, the petitioner was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316 (citing *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)).

## A. Failure to Present a Defense

The petitioner contends that trial counsel was ineffective in failing to present evidence implicating the victim's mother and establishing a "break in the chain of events for felony murder." The post-conviction court found that trial counsel made a strategic decision to present a defense that the petitioner did not intend to harm the victim and that, as a result, a conviction for a lesser-included offense to felony murder was warranted.

This Court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance. *See Strickland*, 466 U.S. at 690. We may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a particular strategy or tactic failed, standing alone, does not establish that trial counsel was deficient. *House v. State*, 44 S.W.3d 508,

515 (Tenn. 2001). A defendant's own statements and action may determine the reasonableness of trial counsel's actions. *Felts*, 354 S.W.3d at 277.

In the present case, trial counsel reviewed discovery, which included Ms. Rogers' statement to the police that she had slapped the victim's hand. Trial counsel also reviewed the recording of the 9-1-1 call and the transcript of the preliminary hearing. She had the petitioner's statement to the police in which he admitted to striking the victim repeatedly. Trial counsel filed a motion to suppress the petitioner's statement, and the trial court denied the motion. The petitioner told trial counsel that he did not intend to cause the injuries. Trial counsel also met with the medical examiner on multiple occasions.

Trial counsel was aware that the physical evidence established that the victim was spanked repeatedly and sustained injuries to her back, buttocks, legs, and arms such that the medical examiner could not determine where one bruise ended and another bruise began. Trial counsel testified that any strategy implicating Ms. Rogers for causing the victim's death was not consistent with the physical evidence. Rather, trial counsel determined that a more reasonable defense strategy involved establishing that the petitioner's actions were a form of discipline, that the petitioner did not intend to injure the victim, and that as a result, the petitioner should be convicted of "a lesser charge of negligent or reckless homicide." This Court concludes that trial counsel made a reasonable strategic decision based upon adequate preparation.

The petitioner cites *State v. Honeycutt*, 54 S.W.3d 762 (Tenn. 2001), to support his claim that trial counsel's failure to implicate Ms. Rogers was deficient performance. In *Honeycutt*, the defendant was convicted of aggravated child abuse and argued on direct appeal that trial counsel was ineffective in failing to present evidence implicating the victim's mother as the perpetrator. *Honeycutt*, 54 S.W.3d at 765. Trial counsel knew prior to trial that the victim's mother had access to the victim in the hours preceding the injury and admitted that she had previously shaken the victim and could harm the victim because the victim "got on her nerves." *Id.* at 768. Trial counsel, however, failed to question the victim's mother about this incriminating evidence and admitted that his failure to do so was not a strategic decision. *Id.* The Tennessee Supreme Court held that trial counsel was deficient in failing to develop an alternative theory of defense and that the failure to elicit testimony implicating the victim's mother as the perpetrator resulted in prejudice.

We conclude that *Honeycutt* is distinguishable from the present case. In *Honeycutt*, trial counsel completely abandoned a defense theory supported by credible

14

evidence that someone else had committed the offense. In the present case, trial counsel developed a theory of defense that the petitioner's conduct did not constitute felony murder and utilized a trial strategy to advance that theory. As a result of trial counsel's efforts, the trial court instructed the jury on reckless homicide and criminally negligent homicide. Moreover, unlike trial counsel in *Honeycutt*, trial counsel in the present case developed a reasonable defense strategy based on adequate preparation and investigation. *See Adrianne Kiser v. State*, No. W2014-02429-CCA-R3-PC, 2015 WL 6873468, at *9 (Tenn. Crim. App. Nov. 6, 2015), *perm. app. denied* (Tenn. Mar. 23, 2016); *see also Claude F. Garrett v. State*, No. M2011-00333-CCA-R3-PC, 2012 WL 3834898, at *22 (Tenn. Crim. App. Sept. 5, 2012), *perm. app. denied* (Tenn. Feb. 25, 2013) (noting that "[t]he petitioner essentially complains that trial counsel did not use every bit of evidence at his disposal to discredit the State's theory. We do not read *Honeycutt* to impose such a standard.").

Furthermore, the petitioner did not present any evidence demonstrating that Ms. Rogers' conduct could have caused the victim's death or could have otherwise constituted a "break in the chain of events." Accordingly, the petitioner has failed to establish a reasonable probability that but for any deficiency the result of the trial would have been different. *See Vaughn*, 202 S.W.3d at 116 (citing *Strickland*, 466 U.S. at 694). The petitioner is not entitled to relief regarding this issue.

## B. Opening Statement

The petitioner asserts that trial counsel was ineffective by conceding the defense during her opening statement. The right to effective assistance of counsel extends to opening and closing arguments. *Yarborough v. Gentry*, 540 U.S. 1, 5-7 (2003); *Bell v. Cone*, 535 U.S. 685, 701-02 (2002). Counsel, however, has wide latitude in determining how to best represent a defendant, and deference to counsel's tactical decisions in the opening statement or closing argument is particularly important. *Kevin Lewis v. State*, No. E2014-02070-CCA-R3-PC, 2015 WL 5175664, at *5 (Tenn. Crim. App. Sept. 3, 2015), *perm. app. denied* (Tenn. Dec. 11, 2015) (citing *Torrez Talley v. State*, No. W2009-02036-CCA-R3-PC, 2011 WL 1770485, at *4 (Tenn. Crim. App. May 9, 2011), *perm. app. denied* (Tenn. Sept. 21, 2011)).

During her opening statement, trial counsel informed the jury:

> [The prosecutor is] right, the proof is going to be that [the victim] died of injuries caused by [the petitioner]. This is not a "who done it."

15

This is all about what crime was committed by [the petitioner] on July 28th, 2008.

Listen very carefully to what everybody's testified to, especially Pam Rogers. She was the only other person there besides [the petitioner]. Wait until the Judge gives you instructions on the law at the end of the trial before you decide what crime was actually committed by [the petitioner].

The petitioner argues that by informing the jury that the victim died from injuries that he caused, trial counsel conceded that the petitioner committed the charges of felony murder predicated upon aggravated child abuse and felony murder predicated upon aggravated child neglect. Even if trial counsel was deficient in her opening statement, the petitioner, however, has failed to establish that any deficiency resulted in prejudice. Due to the overwhelming evidence of guilt presented at trial, we conclude that there is no reasonable probability that the result of the trial would have been different had trial counsel not made the comments in her opening statement. The petitioner is not entitled to relief regarding this issue.

## C. Sentencing

The petitioner maintains that trial counsel was ineffective in failing to object when the trial court imposed a sentence of life imprisonment without first holding a sentencing hearing and in failing to object to the trial court's imposition of an illegal sentence. The State responds that the petitioner's argument "is based on a fundamental misunderstanding of the sentencing statutes for first degree murder." We agree with the State.

Tennessee Code Annotated section 39-13-202(c) provides for three possible sentences for a first degree murder conviction: death, life imprisonment without the possibility of parole, or life imprisonment. The State did not file a notice of intent to seek the death penalty or life imprisonment without the possibility of parole. Tennessee Code Annotated section 39-13-208(c) provides that when the State does not file a notice of intent to seek the death penalty or life without the possibility of parole and the defendant is subsequently convicted of first degree murder, "the defendant shall be sentenced to imprisonment for life by the court." While the petitioner argues that the jury should have determined his punishment in accordance with Tennessee Code Annotated section 39-13-204, the procedure outlined in section 39-13-204 does not apply when the State is seeking a life sentence, the minimum sentence for a conviction of first degree murder. Accordingly, trial counsel was not deficient in failing to object to the trial court's

16

imposition of a life sentence without first holding a sentencing hearing following the petitioner's convictions for first degree murder.

The petitioner asserts that his sentence is illegal because the trial court "essentially sentenced [him] to an indefinite amount of time" and that trial counsel was deficient in failing to object to the sentence. The petitioner specifically argues that "[t]he moment the [petitioner] is sentenced to Life in Prison with the Possibility of Parole, but is not sentenced to a term of years, the trial court has essentially sentenced the [petitioner] to prison for an indefinite amount of time, which would be illegal and void on its face."

The petitioner states in his brief that he was sentenced to "life in prison with the possibility of parole." Our statutes, however, do not include this terminology. *See* Tenn. Code Ann. § 39-13-202(c)(1)-(3) (stating that the possible punishment for first degree murder includes death, life imprisonment without the possibility of parole, and life imprisonment). Rather, the petitioner was sentenced to life imprisonment.

For offenses committed before July 1, 1995, Tennessee Code Annotated section 40-35-501(h)(1) governs release eligibility and parole for defendants convicted of first degree murder and sentenced to life imprisonment. *See Vaughn*, 202 S.W.3d at 118. For offenses committed on or after July 1, 1995, such as the offense committed by the petitioner, Tennessee Code Annotated section 40-35-501(i)(1) governs release eligibility for defendants convicted of first degree murder and sentenced to life imprisonment. Subsection (i)(1) provides:

> There shall be no release eligibility for a person committing [murder in the first degree] on or after July 1, 1995. . . . The person shall serve one hundred percent (100%) of the sentence imposed by the court less sentence credits earned and retained. However, no sentence reduction credits authorized by § 41-21-236 or any other provision of the law, shall operate to reduce the sentence imposed by the court by more than fifteen percent (15%).

Tenn. Code Ann. § 40-35-501(i)(1), (i)(2)(A) (Supp. 2008). While a defendant convicted of first degree murder must serve 100% of a sentence of life imprisonment, the defendant is "'entitle[d] to release eligibility . . . after serving sixty years, the equivalent of a life sentence for the purpose of calculating release eligibility,'" less any sentence reduction credits up to 15% or nine years. *Jerry D. Carney II v. Dwight Barbee, Warden*, No. W2011-01977-CCA-R3-HC, 2012 WL 5355665, at *4 (Tenn. Crim. App. Oct. 31, 2012) (quoting Tenn. Op. Att'y Gen. No. 97-098 (1997)); *see Vaughn*, 202 S.W.3d at 118-19.

17

"As a result, Tennessee statutes permit release from confinement for life imprisonment after serving fifty-one years." *State v. Robert Guerrero*, No. M2014-01669-CCA-R3-CD, 2015 WL 2208546, at *2 (Tenn. Crim. App. May 11, 2015), *perm. app. denied* (Tenn. Sept. 17, 2015) (citing Tenn. Code Ann. § 40-35-501(h)(1), (i)(1), (i)(2)(A)). Accordingly, a sentence of life imprisonment is not "an indefinite amount of time" as claimed by the petitioner.

Contrary to the petitioner's claim, the trial court is not required to specify a term of years in sentencing a defendant to life imprisonment. Rather, Tennessee Code Annotated section 40-35-211(1) provides that "[s]pecific sentences for a felony shall be for a term of years or months or *life*, if the defendant is sentenced to the department of correction." (Emphasis added.) Accordingly, trial counsel was not deficient in failing to object to legality of the petitioner's sentence.

## CONCLUSION

For the foregoing reasons, we conclude that the petitioner is not entitled to post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
BRANDON O. GIBSON, SPECIAL JUDGE

18